UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHRISTINA DEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-02200-SEB-TAB |
| | ) | |
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Dkt. No. 58], filed on September 7, 2018. Plaintiff Christina Dean brings this action against her former employer, Defendant Eli Lilly and Company ("Lilly"), alleging that she was subjected to a hostile work environment based on her military service and terminated in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). For the reasons detailed below, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

**<u>Factual Background</u>**

**I.      Plaintiff's Military Service and Employment History**

Ms. Dean has served in the National Guard of the United States almost continuously since August 1996. She began working for Lilly in November 1999 as a contract employee and was hired as a full-time Lilly employee one year later, in November 2000, as a Study Drug Coordinator. In 2004, Ms. Dean became a Project Management Associate with Elanco Animal Health, then a division of Lilly. In March

1

2007, she joined Lilly's Consumer Product Quality Assurance ("CPQA") group as a Quality Assurance Associate. Although her title was later changed to Associate Consultant Quality Assurance ("Quality Associate"), her duties did not change, and she remained in this same role throughout her employment with Lilly.

While she worked as a Lilly employee, Ms. Dean had regular National Guard obligations on the weekends and occasionally on the weekdays. Additionally, Ms. Dean took two extended leaves of absence from Lilly for overseas deployments, the first from November 2008 to October 2010 and the second from April 2011 to February 2014. Ms. Dean testified that she had no complaints with the manner in which Lilly handled her leaves of absence. Upon her return from her second overseas deployment in February 2014, Ms. Dean resumed her role with Lilly as a Quality Associate.

## II. Comments from Plaintiff's Coworkers and Supervisors Regarding Military Service Between Her First and Second Deployments

According to Ms. Dean, in the sixth-month period between her first and second deployments, a number of her coworkers and supervisors made disparaging comments about her military service. In October 2010, approximately two months after Ms. Dean returned from her first overseas deployment, one of her supervisors at the time, Eric Ballman, indicated on a performance management form that she would undergo training as a "new employee" despite the fact that, apart from her deployment, she had been working for Lilly at that point for approximately ten years. When Ms. Dean complained about the wording on the form, the reference to her being a new employee was removed.

Around this same time, another supervisor, Andy Minor, overheard Ms. Dean on a telephone call regarding an upcoming military drill weekend she was scheduled to attend. When she hung up the telephone, Mr. Minor inquired, "Are you still doing that stuff?" Dean Dep. at 131. After Ms. Dean confirmed that he was referencing her military commitments, she answered in the affirmative. Mr. Minor responded, "Oh, that's too bad because, you know, I was just about to consider you for a lead position." *Id.* Ms. Dean told Mr. Minor that her military career had never affected her job performance at Lilly and that his comment was inappropriate. *Id.* It is not clear whether any lead positions were open at that time, but Ms. Dean testified that she was not interested in a lead position and it is undisputed that she never applied for one. *Id.* at 138–39.

On another occasion, after a coworker reportedly saw Ms. Dean crying in the bathroom about her divorce proceedings, Mr. Ballman approached Ms. Dean and indicated that her coworker was concerned that she was suicidal. He then stated, "I know the military's stressful. I know you are going through a lot with the military." Dean Dep. at 122. Mr. Ballman apparently reported this incident to Mr. Minor who, in turn, reported to HR that Ms. Dean was suicidal because of the military and also told Ms. Dean's coworkers to pray for her because she had tried to commit suicide. The HR representative then contacted Ms. Dean and recounted her daughter's negative experience in the military, stating that she knew "how bad they treat women in the military" and that she was "really sorry" for Ms. Dean. *Id.* at 142.

According to Ms. Dean, a number of other coworkers made anti-military comments to her during the six months between her first and second deployments. One

coworker in particular, Karen Johnson, would ask Ms. Dean questions about the military and would then roll her eyes or start talking with other coworkers when Ms. Dean started to answer the questions.  Dean Dep. at 144.

Ms. Dean also testified that, although she could have taken military leave to fulfill her National Guard training commitments, she eventually stopped doing so because she received "feedback that, well, you shouldn't get military leave and vacation."  *Id.* at 66, 71.

At some point following these incidents but before she requested her second leave of absence in April 2011, Ms. Dean reported to Lilly's Human Resources ("HR") department "on the way [she] had [been] treated in [her] short return back and some of the negative comments made to [her] about the military …."  Dean Dep. at 120.  She believed that because of her military service she had been "presented in a negative light." *Id.*  Nothing was done following her complaints.  *Id.* at 67.

In April 2011, Ms. Dean requested a leave of absence to begin on April 26, 2011 so that she could return to duty, despite having returned from her first deployment only six months before.  Ms. Dean said she requested that leave because of the manner in which she was treated at Lilly regarding her military service.  *Id.* at 120–21.

## III.    Comments from Plaintiff's Supervisor Following Second Deployment

In February 2014, after she had completed her second overseas deployment, Ms. Dean returned to her position with Lilly as a Quality Associate.  Ms. Dean was uncertain about returning to work at Lilly because she had been told that other Lilly employees, particularly Mr. Ballman and Raegan McGraw, had continually made negative comments

about her military service while she was deployed.  Upon her return, Ms. Dean was supervised by Ms. McGraw.

During Ms. Dean's one-day training period following her second deployment, Ms. McGraw entered the room on several occasions and each time would either state that she was going to join the military or would made negative comments about the military or about Ms. Dean's military service.  Dean Dep. at 272.  Every time Ms. Dean's military service was mentioned, Ms. McGraw would look at anyone who was nearby and roll her eyes or throw her head back and laugh.  Dean Dep. at 253–54, 272.  Ms. Dean felt that Ms. McGraw's behavior was "a taunting kind of thing in front of other people."  *Id.* at 253–54.

On one occasion shortly after she returned from her second deployment, Ms. McGraw came into Ms. Dean's office and began to talk about the military, stating that she was thinking about joining and inquiring how Ms. Dean had enlisted and how she had become an officer.  Ms. Dean responded that Ms. McGraw was over the age limit to join the military and that her job was not one that was needed by the military at that time.  Ms. McGraw stated that she was going to try to join anyway so that she could receive the benefits.  When Ms. Dean told her that she would have to become an American citizen to do that, Ms. McGraw stated that she was "just going to stay a Canadian citizen" and would "just try to get unemployment."  Dean Dep. at 250–52.  According to Ms. Dean, Ms. McGraw's behavior during this exchange was "passive-aggressive" and "catty."  *Id.* at 252–53.  On another occasion, Ms. McGraw asked Ms. Dean why she joined the military, and then said, "I'm Canadian, and we don't agree with a lot of that."  *Id.* at 273.

Finally, in early 2015, Ms. McGraw instructed Ms. Dean to remove "military related items" from her performance review. Lilly's performance review forms include a section where employees can list outside experience or education either as goals or achievements. In that section, Ms. Dean "always put a blurb … about how [her] military training related to [her] job at Lilly." Dean Dep. at 201. She believed the information she included regarding her military service "was important to [her] work at Lilly" because it "was related to leadership, development, developing others, mentoring others, or being mentored" and "also involved writing standardized operating procedures." *Id.* at 202–04. According to Ms. Dean, she included on her performance review any military experience "that she could transfer over into [her] Lilly experience or [her] Lilly growth," such as "how [she] related to different cultures [and her] leadership skills." *Id.* at 269. However, Ms. McGraw instructed Ms. Dean to remove these military references from her performance review because McGraw believed they were "contrary to Lilly's work" and conflicted with Lilly's values. Dean Dep. at 268–69. Ms. McGraw told Ms. Dean that she planned to follow up with HR to determine whether the company shared her concerns. *Id.* at 270.

Ms. McGraw denies ever making disparaging comments about the military, asking Ms. Dean to remove references to her military service from her performance evaluation, or stating that her military service was contrary to Lilly's work or created a conflict with Lilly's values.

## IV. Responsibilities of the Quality Associate Role

As a Quality Associate, Ms. Dean's primary responsibility was to participate in the

process of "assessing." Dean Dep. at 8, 170. This process involves reviewing complaints that Lilly receives from North, South, and Central America, creating a complaint record, assessing the complaints (including severity level and category), alerting management to priority complaints, entering other information in the complaint database, and attaching relevant documents. McGraw Decl. ¶ 5. Once the record is created, the Quality Associate is responsible for evaluating the complaint and determining, based on criticality, how to proceed. Rice Dep. at 9; McGraw Dep. at 9–10; Dean Dep. at 104–05.

Each complaint assessment also includes a second person verification ("SPV"), which is a process in which a second Quality Associate reviews all of the information in the database for each complaint, including information such as the notification date and country of origin, to ensure that it matches the information contained in the attached documentation in order to confirm that the information was entered correctly by the first Quality Associate. Dean Dep. at 208; Rice Dep. at 10–13; McGraw Dep. at 10. To complete the SPV process, the second Quality Associate must click through eight to twelve screens or hyperlinks containing different fields of information entered by the first Quality Associate and confirm the accuracy of the information on each screen. McCraw Decl. ¶¶ 9, 11. Once the accuracy of the information is confirmed, the second Quality Associate then signs his or her name in a box on the screen attesting that the information is correct. Although the second Quality Associate is not supposed to sign his or her name unless and until he or she has clicked through each of the screens and confirmed that the information is correct, the signature box is accessible when first entering the database. In other words, the second Quality Associate can access the signature box even if she has

not yet clicked through each of the information screens. *Id.* ¶ 11.

According to Ms. Dean, she was able to complete the SPV process "really fast" and with a low error rate, which she believes is the reason Ms. McGraw assigned her to work only on the SPV process. Dean Dep. at 177; 205–06. Before the incident that led to Ms. Dean's termination, Ms. McGraw never expressed concern that she (Dean) was completing the SPV process too quickly. *Id.* at 191.

## V.     Plaintiff's Computer Issues

Shortly after she was assigned to act as a second-person verifier, Ms. Dean informed Ms. McGraw that her computer had been malfunctioning and that she had been unable to open the Adobe Acrobat documents she needed to access in order to complete the SPV process. She also stated that her computer would at times shut down altogether in the middle of the SPV process or revert to a different document while she was working. According to Ms. Dean, Ms. McGraw told her to continue doing what she could despite being unable to review Adobe attachments because if the wrong document were attached to a complaint, "[i]t would be a deviation on whomever created the complaint," not on the second-person verifier. Dean Dep. at 206.

## VI.     Plaintiff's Termination

In early November 2015, a lawsuit was filed against Lilly by multiple plaintiffs. A Quality Associate in Ms. Dean's CPQA group, Luther Rice, was assigned to create complaint records in the database for each of the individual plaintiffs in the lawsuit. Rice Dep. at 16; McGraw Decl. ¶ 14; Exh. 1 to McGraw Decl. Ms. Dean was performing the SPV process for the complaint records Mr. Rice was creating. Rice Dep. at 16, 22–24;

Dean Dep. at 206–07. At some point in the process, Mr. Rice realized that he had mistakenly attached the wrong PDF file to each of the records he had created, which meant that the data he had entered into the database for each of the plaintiffs in the lawsuit did not match the data in the attached initiating complaint. Rice Dep. at 15. Mr. Rice contacted Ms. Dean and told her to stop reviewing his work because he had made a mistake. Dean Dep. at 206–07. Up to that point, Ms. Dean had verified as accurate each of the complaint records Mr. Rice had completed and had not alerted him to any issues. *Id.* Mr. Rice then contacted their supervisor, Ms. McGraw, to inform her that he had entered into the database inaccurate information that had been verified as accurate by Ms. Dean. McGraw Decl. ¶¶ 13, 15.

According to Ms. Dean, after Mr. Rice instructed her to stop reviewing his work, she went to Ms. McGraw and stated that she was worried about Mr. Rice because he was concerned that some of his complaints had errors in them. Ms. Dean reminded Ms. McGraw of the computer issues she had been having, to wit, that she could not open Adobe Acrobat documents to verify that the correct document was attached to each complaint. According to Ms. Dean, Ms. McGraw told her that she should just review the documents she could access and reiterated that, if there were any deviations, they would be attributed to Mr. Rice. Dean Dep. at 208; 210.

After receiving notification of the error, Ms. McGraw, in conjunction with her supervisor Elizabeth Harrigan and Associate Consultant-US Employee Relations

Mascelia Miranda,[1] initiated an investigation into the incident. McGraw Decl. ¶ 17. Ms. McGraw determined that Ms. Dean had verified as accurate roughly a dozen complaint records against documents that did not support the accuracy of the records. For example, in several of the complaint records at issue, the patient and case numbers that had been entered into the database did not match any of the patients or case numbers in the PDF file attached to that complaint record. *Id.* ¶¶ 16, 18; McGraw Decl. Exh. 1.

Ms. McGraw and Ms. Harrigan first hypothesized that Ms. Dean had verified inaccurate information because she did not understand the SVP process. Accordingly, they asked Ms. Dean to write out in detail the steps involved in the SVP process and instructed her to be as thorough as possible. McGraw Dep. at 29–30; McGraw Decl. ¶ 19. Ms. Dean did as instructed and created a very complete recitation of each of the steps involved in the SPV process, which demonstrated that she understood how to correctly SPV a case. McGraw Decl. ¶ 20.

After confirming Ms. Dean's knowledge of the SPV process, Ms. McGraw, Ms. Harrigan, and Ms. Miranda reviewed the time records associated with Ms. Dean's SPV work. *Id.* ¶ 23. When changes are made in Lilly's complaint database, they are timestamped. As it relates to SPV work, Quality Associates make only one change in the database on each complaint, to wit, e-signing his or her name to verify that the record has been reviewed and all data entered accurately. *Id.* ¶ 22. Lilly's records showed that Ms.

---

[1] Ms. Miranda is a veteran who served in the U.S. Army on active duty from 1981 to 1984. She then served in the Army Reserves until her final honorable discharge on August 29, 1994 by which point she had achieved the rank of Captain. Def.'s Ans. to Pl.'s First Set of Interrog., Ans. No. 4.

Dean was completing the review and verification of complaint records in very short periods of time. She would frequently verify a complaint record in less than one minute and would at times verify multiple complaint records within that time. With regard to the complaint records created by Mr. Rice, Lilly determined that Ms. Dean had reviewed and verified three of the inaccurate records within the same one-minute time period. *Id.* ¶ 24. As part of the investigation, Ms. McGraw spoke with a few other Quality Associates who stated that it took them on average about five minutes to SPV one complaint record. *Id.* ¶ 25. Mr. Rice testified that he has at times been able to complete the SPV process in less than four minutes. Rice Dep. at 15.

Ms. McGraw conducted a test, calculating the length of time it took her to simply click through the screens a Quality Associate is required to open and review when second person verifying. McGraw Decl. ¶ 27. With Ms. Harrigan and Ms. Miranda observing, Ms. McGraw entered the database, pulled a complaint record, and clicked straight through all the screens and hyperlinks without attempting to match or review the data or perform the actual SPV work. *Id.*; McGraw Dep. at 33. Although she was only clicking straight through the required screens and not attempting to review and verify the data as the SPV process requires, Ms. McGraw was unable to do even that within one minute. McGraw Dep. at 33; McGraw Decl. ¶ 28. However, she was able to open the complaint record, go directly to the verification signature box, electronically sign, and close the complaint record without reviewing any of the required data fields or pop up screens in under a minute. McGraw Decl. ¶ 29. No one at Lilly ever timed Ms. Dean to see how quickly she could perform the SPV process nor did anyone consult with the IT staff to

determine whether it was possible to properly perform the SPV process faster than Ms. McGraw was able to complete it. Dean Dep. at 33–34.

On November 13, 2015, Ms. McGraw, Ms. Harrigan, and Ms. Miranda met with Ms. Dean to discuss the incorrect second person verifications she had completed. During this meeting, Ms. Dean stated that the information in the attachments she had reviewed while second person verifying Mr. Rice's complaint records matched the information Mr. Rice had inputted. According to Ms. Dean, she was shocked when she was told that the wrong files had been attached to Mr. Rice's complaint records and that she had incorrectly verified them. Dean Dep. at 215. At the meeting, Ms. Dean reminded Ms. McGraw that she had been having computer problems, namely, when she would open Adobe Acrobat attachments, they would at times revert back to "a previously opened Adobe Acrobat document that [she] had in [her] history that [she] had just opened in the last several complaints." *Id.* at 211–12. On the day of the incident, Ms. Dean had been verifying several of Mr. Rice's complaints and therefore had all his attachments on her computer. She believes that she did not realize that Mr. Rice's complaints had the wrong attachments because, as a result of the computer glitch, in each case where she failed to correctly verify the documentation, the incorrect document, unbeknownst to her, had reverted to another attachment that happened to be correct. Dean Dep. at 213–15.

Ms. McGraw, Ms. Harrigan, and Ms. Miranda did not credit Ms. Dean's explanation of what had occurred, concluding that it was impossible for her to have reviewed all the necessary information within the time period shown by the system. In addition, they did not believe that the computer had, on its own and without her

12

knowledge, switched each document she had reviewed to another document that happened to be the correct one. McGraw Decl. ¶¶ 31–32. In their opinion, Ms. Dean had falsified the second person verification and had not been forthright during the investigation. *Id.* ¶ 33; McGraw Dep. at 30–31. Misconduct, which includes falsification of documents and dishonesty, is an immediately separable offense under Lilly's disciplinary policy. Dean Dep. at 51, 53; Dean Dep. Exh. 2. Ms. Dean's employment with Lilly was terminated for this misconduct, effective November 20, 2015.

## VII. The Instant Complaint

Ms. Dean filed her Complaint in this action on June 27, 2017, alleging that Lilly discriminated against her based on her sex and race in violation of Title VII and because of her military service, in violation of the USERRA. Ms. Dean's Title VII claims were dismissed by the Court on October 31, 2017. Lilly filed the instant motion for summary judgment as to Ms. Dean's USERRA claim on September 7, 2018.

## Legal Analysis

## I. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.    Discussion

Ms. Dean claims in this lawsuit that she was subjected to a hostile work environment and ultimately terminated based on her military service in violation of the USERRA. We address these claims in turn.

### A.    Hostile Work Environment Claim

Even assuming that a hostile work environment claim is cognizable under USERRA,[2] Ms. Dean has forfeited any such claim by failing to substantively address any of the arguments raised in Defendant's motion for summary judgment. Her argument, which consists merely of three conclusory sentences and completely lacking of any discussion of facts or case law, is insufficient to avoid summary judgment. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) ("We agree with the district court's determination that [the plaintiff] waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal argument in response to [the defendant's] motion for summary judgment."); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived ...."); *United States v. Dunkel*,

---

[2] The parties have not pointed us to, nor have we found, any Supreme Court or Seventh Circuit case addressing this issue. *McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-cv-06500, 2014 WL 4269126, at *7 (N.D. Ill. Aug. 28, 2014) ("Neither the Supreme Court nor the Seventh Circuit has explicitly decided whether a hostile work environment claim is cognizable under USERRA").

927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.").  Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim under USERRA.

### B.    Discrimination Claim

Ms. Dean also claims that she was terminated because of her military service in violation of USERRA.  An employer violates USERRA when an employee's membership in the uniformed service is "a motivating factor" in an adverse employment action "unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service[.]"  38 U.S.C. § 4311(c)(1).

An analysis of this claim invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.  The parties here do not utilize the *McDonnell Douglas* approach and

focus instead on the cumulative evidence going to causation; thus, we follow their lead and do the same.

A plaintiff "may demonstrate causation through evidence of, for example, comments or animus toward the protected group, suspicious timing, more favorable treatment of similarly situated employees, or pretextual reasons given for the adverse employment action." *Beverly v. Abbot Labs.*, No. 17 C 3003352, 2019 WL 3003352, at *7 (N.D. Ill. July 10, 2019) (citing *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017)). In support of her discriminatory termination claim, Ms. Dean focuses primarily on anti-military animus demonstrated by Ms. McGraw, comments critical of the military made by other Lilly employees, and what she claims was Lilly's pretextual reason for terminating her.

Specifically, Ms. Dean maintains that there was a "deep, persistent strain of anti-military sentiment at Lilly, that [Ms.] McGraw was tainted by that strain, and that McGraw intentionally set Dean up to be terminated" because of her military service. Pl.'s Resp. at 15. Ms. Dean cites a number of anti-military comments made by co-workers as well as by supervisors she had prior to Ms. McGraw to demonstrate the widespread anti-military bias she perceived at Lilly. However, for a stray remark to establish discriminatory motivation, it must be "(1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010). The decisionmakers in this case were Ms. McGraw, Ms. Harrigan, and Ms. Miranda. Accordingly, the statements made and actions taken by employees and supervisors other

than these decisionmakers are irrelevant to our analysis, particularly because such conduct occurred long before the termination decision was made. Ms. Dean has presented no evidence to show that any of the decisionmakers were aware of such animus in a way that they could be said to have been tainted by that anti-military bias evinced by other Lilly employees.

Ms. Dean has also presented evidence regarding Ms. McGraw's own disparaging remarks regarding military service, particularly her alleged comment that military service was "a conflict of interest" with Lilly's values as well as her statement that, as a Canadian, she "did not agree" with military service. Ms. Dean argues that these statements, coupled with Ms. McGraw's pivotal role in her termination, suffices to support an inference that her military service was a motivating factor in Lilly's decision to fire her.

We agree that the evidence cited above, if credited by the jury, could support a finding that Ms. McGraw personally harbored an anti-military bias. However, "[a]nimus or frustration alone…does not support a claim of discrimination. It must have been linked, as a motivating factor, to an adverse employment action." *Arroyo v. Volvo Group N. Am., LLC*, 805 F.3d 278, 285 (7th Cir. 2015). Here, none of the statements made by Ms. McGraw were close in time to Ms. Dean's termination. The most recent comment Ms. Dean alleges that Ms. McGraw made was in early 2015, and Ms. Dean was not discharged until several months later, on November 20, 2015. Moreover, none of the comments made by Ms. McGraw was even remotely connected to the termination decision. *See Teruggi v. CIT Group/Capital Fin., Inc.*, 709 F.3d 654, 656–57 (7th Cir.

2013) (holding that "isolated events or comments with no apparent connection to the termination decision[] do not support a reasonable inference of discrimination").

Even if Ms. Dean could prove that her military service motivated Ms. McGraw's part in the termination decision, her USERRA claim cannot survive summary judgment because Lilly has shown that Ms. Dean would have been terminated for misconduct, specifically, the falsification of records and dishonesty, regardless of her military affiliation. Ms. Dean contends that Ms. McGraw "set [her] up" to be terminated because of discriminatory animus. Pl.'s Resp. at 17. Ms. Dean claims that when she told Ms. McGraw that she was having trouble accessing PDF attachments on her computer, McGraw instructed her to "'do what [she could],' that it was 'no biggie,' and that the work had to get done." *Id.* at 18. According to Ms. Dean, Ms. McGraw also told her "don't worry" about "any errors" because they "won't be a deviation on you." Dean Dep. at 209. Even if true, the fact that Ms. McGraw may have told Ms. Dean that she should perform as much of the SPV work as possible and that she should not worry about errors caused by her computer issues does not save Ms. Dean's USERRA claim.

Ms. Dean was terminated, not because Lilly believed she had made an error in the SPV process, but because of its determination that she had falsified documents by representing that she had verified entries when she had not in fact done so and then was unforthcoming in the subsequent investigation. When questioned during Lilly's investigation, Ms. Dean claimed that she had reviewed the information inputted in each of the complaint records by Mr. Rice, individually opened each PDF attachment containing the source documents, verified that the information matched, and then

electronically signed her name swearing as much. The only explanation Ms. Dean offered to explain the inaccurately verified complaint records was that her computer must have, without her knowledge, reverted to the correct attachment each time she was verifying the information.

As part of its investigation, Lilly reviewed the time stamps on Ms. Dean's SPV work which showed that she had verified three of the complaints in question in the same one-minute time period. Other Quality Associates inquired of by Lilly reported that it took anywhere from three to five minutes to properly verify one complaint record. After conducting additional tests in the system to see how quickly the SPV process could be correctly performed, Ms. McGraw, Ms. Miranda, and Ms. Harrigan determined that it would have been impossible for Ms. Dean to have completed the SPV process in the way she said she had in the time the system showed she had been in the database. They also did not find credible her explanation that her computer had, on its own and without her knowledge, switched the document she was reviewing to a different document that coincidentally happened to be the document that matched the information in the database. Based on these facts, Ms. McGraw, Ms. Miranda, and Ms. Harrigan concluded that Ms. Dean had falsified company records and had not been forthright during the investigation. Their decision to terminate her for misconduct under Lilly's disciplinary policies followed.

Ms. Dean has failed to adduce any evidence to establish that this explanation was merely pretext for discrimination based on her military service. Although Ms. Dean argues that Ms. McGraw told her that she would not be responsible for errors caused by

her computer issues, she concedes that McGraw never told her that it would be acceptable to simply to sign off on the SPV process regardless of whether she was able to perform the second-person verification duties, which is what Lilly determined she had done. There is no dispute that Lilly considers misconduct, including falsification of documents and dishonesty, to be an immediately separable offense. When Lilly determined that Ms. Dean had engaged in such conduct, she was immediately terminated. Ms. Dean has offered no evidence that Lilly treated other employees who had falsified records or been untruthful in an investigation more favorably. There is no evidence of any instance in which Lilly found an employee to have falsified a complaint record or second-person verification and yet did not terminate that person.

Ms. Dean points to what she claims are deficiencies in the investigation, including Lilly's failure to time her on the SPV process to see how quickly she could perform it or to ask the IT staff whether it was possible to perform the SPV process as fast as she was able, as well as the fact that the SPV program "does not time stamp the screens in the process" and instead only shows the completion time of a second-person verification. Pl.'s Resp. at 17. While Ms. Dean may believe there was a better way for Lilly to have conducted its investigation, this is not enough to prove pretext without some evidence that Lilly lied about its reason for firing her. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). It is well-established that we "do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision." *Id.* Rather, "[o]ur only

concern is whether the legitimate reason provided by the employer is in fact the true one." *Id.* Because all the evidence before us indicates that the decisionmakers honestly believed that Ms. Dean had falsified records and was not entirely candid during the investigation and that such misconduct was an immediately terminable offense, Ms. Dean has failed to prove pretext.

For these reasons, Ms. Dean's discrimination claim under USERRA cannot survive summary judgment.

## III. Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment is <u>GRANTED</u>. Final judgment shall be issued accordingly.

IT IS SO ORDERED.


Date: _____8/13/2019_____        _Sarah Evans Barker_

                                    SARAH EVANS BARKER, JUDGE
                                    United States District Court
                                    Southern District of Indiana


Distribution:

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP (Indianapolis)
ellen.boshkoff@faegrebd.com

Sarah Elizabeth Caldwell Breslin
FAEGRE BAKER DANIELS LLP (Indianapolis)
sarah.breslin@faegrebd.com

Rozlyn M. Fulgoni-Britton
FAEGRE BAKER DANIELS LLP (Indianapolis)
rozlyn.fulgoni-britton@faegrebd.com

Jay Meisenhelder
JAY MEISENHELDER EMPLOYMENT & CIVIL RIGHTS LEGAL SERVICES PC
jaym@ecrls.com

Amanda L. Shelby
FAEGRE BAKER DANIELS LLP (Indianapolis)
amanda.shelby@faegrebd.com